UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,

          Plaintiff,

    v.                                                        21-CV-398-LJV-JJM
                                                                DECISION & ORDER
PAOLO PROVENZI, *et al.*,

          Defendants.

_____

From 2003 until 2019, a 1996 Ferrari F50 (the "Ferrari") travelled around the world—from Italy to Japan to Canada. *See* Docket Items 1 at ¶¶ 4-6; 24-21 at ¶¶ 4-5; 31-3 at 17-19; 31-5 at 16. But in December 2019, the United States Customs and Border Patrol ("CBP") stopped the long road trip in Buffalo, New York, as the Ferrari entered the United States. Docket Item 1 at ¶ 6. An ownership dispute over the Ferrari quickly developed, and the United States commenced this interpleader action, asking this Court to decide what at least in words is a simple question: who owns the Ferrari? Docket Item 1.

## PROCEDURAL BACKGROUND

When the Ferrari entered the United States, its plates were registered to defendant Ikonick Collection Ltd. ("Ikonick"), an entity owned by defendant Mohammed Alsaloussi (collectively, the "Ikonick defendants"). *Id.* at ¶¶ 6, 15. CBP investigated the Ferrari's history and learned that it had been reported stolen in Italy in 2003. *Id.* at ¶ 10. At the time of the alleged theft, AUTOEXOTIC SAS di Paolo Provenzi & C ("Autoexotic")—a now-dissolved Italian limited partnership among two brothers, Paolo

and Roberto Provenzi, and their father, Remigio Provenzi—owned the Ferrari.  Docket Item 24-21 at ¶¶ 2, 4, 10; Docket Item 24-5 at 2.

In March 2020, CBP seized the Ferrari under 19 U.S.C. § 1627a(a)(1)(A) and began forfeiture proceedings.  Docket Item 1 at ¶ 12.  Paolo Provenzi[1] and Ikonick filed dueling petitions for remission.  *Id.* at ¶¶ 13-14.  CBP then denied Ikonick's petition and granted Provenzi's petition, but that was not the end of the road: The Ikonick defendants filed a claim to ownership and posted a bond to put the brakes on the administrative forfeiture proceedings.  *Id.* at ¶¶ 16-18.

On March 17, 2021, the United States filed this interpleader action under Federal Rule of Civil Procedure 22 and 28 U.S.C. § 1332.  *Id.* at ¶ 1.  Alleging that it "is in great doubt as to [who] may be entitled to the [Ferrari]," *id.* at ¶ 20, the United States asks this Court to determine who owns it.

Provenzi and the Ikonick defendants each answered and brought cross-claims against the other; Provenzi also brought counterclaims against the United States. Docket Items 9 (Ikonick defendants' answer); 10 (Provenzi's answer).  This Court then referred the action to United States Magistrate Judge Jeremiah J. McCarthy for all proceedings under 28 U.S.C. § 636(b)(1)(A) and (B).  Docket Items 11, 22.

On June 28, 2021, Provenzi moved for summary judgment on his claim for replevin and for a declaration that he is the sole and exclusive owner of the Ferrari. Docket Item 24.  On October 1, 2021, the Ikonick defendants responded, Docket Item 31, and moved to amend their answer to Provenzi's counterclaims and cross-claims,

---

[1] All references to Provenzi in this decision and order are to Paolo Provenzi unless otherwise noted.

Docket Item 29.  About two months later, Provenzi replied to the Ikonick defendants'

opposition, Docket Item 33, and responded to their motion to amend, Docket Item 34.  A

week later, the Ikonick defendants replied.  Docket Item 35.

On January 12, 2022, Judge McCarthy issued a Report and Recommendation

("R&R") finding that Provenzi's partial motion for summary judgment should be denied

and that the Ikonick defendants' motion should be granted in part and denied in part.

Docket Item 37.  More specifically, Judge McCarthy found that summary judgment

should be denied because the Ikonick defendants were entitled to conduct discovery on

several issues of material fact, including the circumstances surrounding the alleged theft

of the Ferrari, the Ferrari's registration history, and Provenzi's interest in the Ferrari viz-

à-viz the other former partners of Autoexotic.  *Id.* at 5-9.  He also found that these

issues of fact precluded him from conducting a choice-of-law analysis at this stage of

the litigation.  *Id.*  Regarding the motion to amend, Judge McCarthy recommended that

the Ikonick defendants' request to amend their answer to include a statute of limitations

defense be denied but that they be permitted to amend their answer to include a Rule

44.1 notice of intent to raise issues of foreign law.  *Id.* at 10-11.

On February 15, 2022, Provenzi objected to the R&R, arguing that Judge

McCarthy should have conducted a choice-of-law analysis, that under such an analysis

New York law would apply, and that under New York law no issues of material fact

precluded finding that Provenzi owns the Ferrari.  Docket Item 40.  Moreover, he

objected to Judge McCarthy's recommendation that the Ikonick defendants be allowed

to amend their answer to include a Rule 44.1 notice.  *Id.*  On March 9, 2022, the Ikonick

defendants responded to the objection.  Docket Item 42.  Two weeks later, Provenzi replied.  Docket Item 43.

A district court may accept, reject, or modify the findings or recommendations of a magistrate judge.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3).  The court must review *de novo* those portions of a magistrate judge's recommendation to which a party objects.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3).

This Court has carefully and thoroughly reviewed the R&R; the record in this case; the objection, response, and reply; and the materials submitted to Judge McCarthy.  Based on that *de novo* review, the Court accepts Judge McCarthy's recommendation to deny Provenzi's motion for summary judgment and to grant in part and deny in part the Ikonick defendants' motion to amend.

## FACTUAL BACKGROUND[2]

The broad contours of the Ferrari's around-the-world travels are undisputed, but the parties do not agree about the exact nature of the transactions that led to those travels or resulted from them.  Here is what we know.

In 2003, Autoexotic acquired the Ferrari and registered it in Italy.  Docket Item 24-21 at ¶¶ 4-5.  According to Provenzi, about a month later, the Ferrari was stolen "from the parking garage of the Donatello Hotel in Imola, Italy."  *Id.* at ¶ 7.  The theft was

---

[2] The Court assumes the reader's familiarity with Judge McCarthy's analysis in the R&R, *see* Docket Item 37, as well as with the facts alleged in the complaint, *see* Docket Item 1; the Ikonick defendants' claim to property and cross-claims, *see* Docket Item 9; and Provenzi's cross-claims and counterclaims, *see* Docket Item 10.

reported both to the Italian police and to the International Criminal Police Organization ("Interpol").  *Id.* at ¶ 8.  Although its route east is a mystery, the Ferrari was registered in Japan a few months after the alleged theft.  Docket Item 31-3 at 17 (Japanese Certificate of Car Registration).  And for nearly sixteen years it apparently remained in Japan where it changed hands several times.  *Id.* at 17-19.

Eventually, it was time for the Ferrari to leave Japan.  According to Provenzi, however, the Ferrari's history as a stolen vehicle stalled things, and so Sabe Japan International Co. Ltd. ("Sabe")—the then-owner of the Ferrari in Japan—tried to smooth the road ahead.  Roberto Provenzi says that in March 2019 he attended a meeting with Akihiro Orimoto, a representative of Sabe, and that Orimoto offered him 100,000 euros to withdraw the Interpol theft report.  Docket Item 33-8 at ¶¶ 5-6; Docket Item 24-1 at ¶ 11.  Withdrawing the report would clear the Ferrari's title and allow Orimoto to export it from Japan.  Docket Item 33-8 at ¶¶ 5-6.  Roberto says that he refused the deal and reported the offer to the Italian authorities.  *Id.* at ¶ 8.

Nevertheless, Sabe was able to sell and export the Ferrari to C.A.R. Leasing in Montreal, Canada, about seven months later.  Docket 31-5 at 16.  And in December 2019, Ikonick registered the Ferrari in Alberta, Canada.  *Id.* at 33.  The sales contract between Sabe and C.A.R. Leasing noted that the car had been "previously reported stolen in [the European Union]."  *Id.* at 14.

After registering the Ferrari in Alberta, Alsaloussi arranged to bring it to the United States.  He says that he filed a CBP Form 3299—that is, a "Declaration for Free

Entry of Unaccompanied Articles"—with CBP to import the Ferrari for his personal use.[3]
Docket Item 31-5 at 25-26.

On December 14, 2019, the Ferrari was on its way from Canada to Florida when
CBP interrupted its travels.  Docket Item 1 at ¶ 6.  During its inspection of the vehicle,
CBP discovered a tar-like substance on the Vehicle Identification Number ("VIN"), which
raised its suspicions about the Ferrari's history.  *Id.* at ¶¶ 7-8.  CBP then learned that
the Ferrari had been reported stolen in Italy, seized it, and began forfeiture proceedings.
*Id.* at ¶¶ 10, 12.  The Ferrari remains in the custody of the Port Director for CBP in
Buffalo, New York.  *Id.* at ¶ 5.

Meanwhile, in November 2015, Autoexotic—the purported original owner of the
Ferrari when it began its travels back in 2003—dissolved.  Docket Item 24-21 at ¶ 10.
Provenzi says that under the terms of the dissolution he became the sole owner of the
Ferrari and that his family members, Roberto and Remigio, no longer have any interest
in it.  *Id.* at ¶ 11.

---

[3] The CBP Form 3299 submitted to the Court by the Ikonick defendants does not
seem to declare the Ferrari, however.  *See* Docket Item 31-5 at 25-26.  Instead, under
description of merchandise, it somewhat confusingly notes only a "travel case for roof."
*Id.* at 26 (capitalization omitted).  Also puzzling to the Court are two documents that the
Ikonick defendants' counsel asserts were "related to the filing of [the] temporary
importation of the [Ferrari]" and seems to imply were filed with the CBP Form 3299.  *Id.*
at ¶ 8.  The first is a letter from Alsaloussi saying that the Ferrari "will be going to Florida
as a snowbird for [six] months[;] then it will be returning [to] Canada."  *Id.* at 24.  But that
letter is dated December 12, 2019, *id.*, two days after Alsaloussi filed the CBP Form
3299, *see* Docket Item 9 at ¶ 31 ("On December 10, 2019, a [CBP Form 3299] . . . was
filed with CBP.").  Even more confusing is a letter from Alsaloussi as the sole owner of
Ikonick stating that Alsaloussi was authorized to bring the vehicle temporarily into the
United States.  Docket Item 31-5 at 27.  That letter is dated January 16, 2020, *id.*, nearly
a month after Alsaloussi first tried to bring the Ferrari into the United States, *see* Docket
Item 1 at ¶ 6.

**LEGAL PRINCIPLES**

I.    **SUMMARY JUDGMENT**

"A motion for summary judgment may be granted 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *Soto v. Gaudett*, 862 F.3d 148, 157 (2d Cir. 2017) (quoting Fed. R. Civ. P. 56(a)).  "Summary judgment is appropriate when 'there can be but one reasonable conclusion as to the verdict,' *i.e.*, 'it is quite clear what the truth is,' and no rational factfinder could find in favor of the nonmovant."  *Id.*  (first quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); then quoting *Poller v. Columbia Broad. Sys., Inc.*, 368 U.S. 464, 467 (1962)).  Conversely, "[s]ummary judgment should be denied if, when the party against whom summary judgment is sought is given the benefit of all permissible inferences and all credibility assessments, a rational factfinder could resolve all material factual issues in favor of that party."  *Id.*  "In deciding such a motion, the court cannot properly make credibility determinations or weigh the evidence."  *Id.* "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."  *Anderson*, 477 U.S. at 255.  "Only in the rarest of cases may summary judgment be granted against a plaintiff who has not been afforded the opportunity to conduct discovery."  *Hellstrom v. U.S. Dep't of Veterans Affs.*, 201 F.3d 94, 97 (2d Cir. 2000).

II.    **INTERPLEADER ACTIONS**

Interpleaders are "triggered by 'a real and reasonable fear of double liability or . . . conflicting claims,'" *Dist. Att'y of N.Y. Cnty. v. Republic of the Philippines*, 307 F. Supp. 3d 171, 189 (S.D.N.Y. 2018) (quoting *Washington Elec. Co-op., Inc. v. Paterson,*

*Walke & Pratt, P.C.*, 985 F.2d 677, 679 (2d Cir. 1993)), and "a handy tool to protect a stakeholder from multiple liability and the vexation of defending multiple claims to the same [property]," *Washington Elec. Co-op.*, 985 F.2d at 679 (citations omitted).  Under Federal Rule of Civil Procedure 22, known as "rule interpleader,"[4] an "interpleader is proper if the party requesting it 'is or may be exposed to double or multiple liability.'" *Id.* (quoting Fed. R. Civ. P. 22(1)).  But "[r]ule interpleader does not provide an independent jurisdictional basis outside of 28 U.S.C. § 1332 which provides for actions between citizens of different states or between citizens of a state and citizens or subjects of a foreign state."[5]  *6247 Atlas Corp. v. Marine Ins. Co., No. 2A/C*, 155 F.R.D. 454, 465 (S.D.N.Y. 1994).  In other words, "in order to assert rule interpleader, a traditional basis for subject matter jurisdiction must exist."  *Id.*

"An interpleader action is normally conducted in two stages."  *Avant Petroleum, Inc. v. Banque Paribas*, 853 F.2d 140, 143 (2d Cir. 1988).  First, courts determine whether the action is appropriate and "whether the stakeholder is entitled to bring an interpleader action."  *Id.*  Next, the court determines "the rights of the competing claimants to the" property.  *Id.*

---

[4] "There are two forms of interpleader: rule interpleader, under Federal Rule of Civil Procedure 22; and statutory interpleader, under 28 U.S.C. § 1335."  *Dist. Att'y of N.Y. Cnty.*, 307 F. Supp. 3d at 189.  Both forms of interpleader join adverse claimants in a single proceeding and "protect [a] stakeholder from multiple lawsuits."  *Id.*

[5] Statutory interpleader, by contrast, provides an independent jurisdictional hook and "requires only minimal diversity—'that is, diversity of citizenship between two or more claimants'"—rather than diversity of citizenship between every claimant. *Dist. Att'y of N.Y. Cnty.*, 370 F. Supp. 3d at 189 (quoting *State Farm Fire & Cas. Co. v. Tashire*, 386 U.S. 523, 530 (1967)).

Interpleader actions are "rooted in equity"—a point often made by the Second Circuit and the district courts within it.  *Washington Elec. Co-op.*, 985 F.2d at 679; *see also Truck-A-Tune, Inc. v. Re*, 23 F.3d 60, 63 (2d Cir. 1994) ("Interpleader is an equitable proceeding."); *Dist. Att'y of N.Y. Cnty.*, 307 F. Supp. 3d at 189-90 (collecting cases).  But "[c]ourts of equity can no more disregard statutory and constitutional requirements and provisions than can courts of law."  *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327-28 (2015).  Accordingly, "courts in this Circuit have held" that in an interpleader action, "legal, rather than equitable, principles govern the adjudication of the merits."  *Dist. Att'y of N.Y. Cnty.*, 307 F. Supp. 3d at 190.  Indeed, courts "most often" discuss the equitable nature of an interpleader when "deciding whether to allow an interpleader to go forward at all"—not when they are adjudicating the merits.  *Id.*  Thus, the equitable nature of interpleader applies primarily in step one, determining whether an action is appropriate; not at step two, adjudicating the merits. *Id.*

## DISCUSSION

I.   **CHOICE OF LAW**

Judge McCarthy acknowledged that "the parties dispute which country's law applies" but then found that "it [was] unnecessary to resolve that issue at this time, since there are issues of material fact concerning the lawful ownership of the automobile that the Ikonick defendants are entitled to explore through discovery."  Docket Item 37 at 5. Provenzi argues that this was error and that Judge McCarthy should have conducted a choice-of-law analysis.  *See* Docket Item 40 at 14, 18-19.

This Court agrees with Provenzi.  To determine whether there are issues of material fact about the lawful ownership of the Ferrari, the Court must decide what lawful ownership means.  And to do that, the Court must first decide what law applies.

When an interpleader action's jurisdiction "is based on [] diversity of citizenship," as it is here, "courts apply the choice-of-law rules of the forum state."  *Citigroup Glob. Mkts., Inc. v. KLCC Invs., LLC*, 2015 WL 5853916, at *6 (S.D.N.Y. Sept. 28, 2015) (alternations omitted), *aff'd*, 706 F. App'x 38 (2d Cir. 2017).  New York's choice-of-law rules therefore apply to this case.

"Under New York law, '[t]he first step in any case presenting a potential choice[-][-]of[-]law issue is to determine whether there is an actual conflict between the laws of the jurisdictions involved.'"  *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara ("Pertamina")*, 313 F.3d 70, 85 (2d Cir. 2002) (citations omitted). "In property disputes, if a conflict is identified, New York choice[-]of[-]law rules require the application of an 'interests analysis,' in which 'the law of the jurisdiction having the greatest interest in the litigation [is] applied and . . . the facts or contacts which obtain significance in defining State interests are those which relate to the purpose of the particular law in conflict.'"[6]  *Id.* (alterations in original) (citations omitted).

## A.    Whether There Is a Conflict

Provenzi argues that New York law applies to the question of ownership.  *See* Docket Items 24-22 at 10-13; 40 at 18-19.  The Ikonick defendants counter that Italian

---

[6] New York also applies an interests analysis to tort claims.  *GlobalNet Financial.Com, Inc. v. Frank Crystal & Co.*, 449 F.3d 377, 384 (2d Cir. 2006). Therefore, regardless of whether Provenzi's cross-claims are construed as property claims or tort claims, an interests analysis applies.

law applies.[7]  Docket Item 31 at 19-25.  So the first question is "whether there is an actual conflict between the laws of the jurisdictions involved"—that is, Italy and New York. [8]  *See Karaha Bodas Co.*, 313 F.3d at 85.  And there is.

### 1.    Italian Law[9]

Under Article 815 of the Italian Civil Code, motor vehicles are considered registered movable property.  Docket Items 24-11 at ¶ 4; 31-2 at ¶ 11; 33-9 at ¶ 17.

---

[7] The Ikonick defendants also argue that "[a]pplicable conflict[-]of[-]law rules require that discovery be had of the contacts of the claimants and events at issue in this case," Docket Item 31 at 23, and they reassert that argument in their response to the objection, Docket Item 42 at 11-12.  But aside from stating New York's choice-of-law rules described above, the Ikonick defendants offer no support for that proposition.  Likewise, they fail to point the Court to a disputed "fact or contact" that needs discovery for the Court to conduct a choice-of-law analysis.  Instead, they point to the Ferrari's significant history in Japan, its exportation to Canada, and its limited time in New York—all facts that are known.  While the parties dispute whether a theft occurred and whether Italian law may divest someone of ownership even in the case of a theft, there is no dispute that any alleged theft took place in Italy.  In other words, although it may be disputed whether the Ferrari was stolen, *see infra* Section II, the Ferrari's traverses across the world are not in dispute, and the Court has the necessary "facts or contacts" to conduct a choice-of-law analysis now.  And if facts learned in the future might change that analysis, the Court can always revisit its decision down the road.

[8] The Ikonick defendants also assert that applying Italian law will require looking at Japanese law "to the extent it is necessary to determine whether [the owners in Japan] were 'good faith' owners of the [v]ehicle."  Docket Item 31 at 23.  Because the Ikonick defendants' argument about the application of Japanese law turns on whether Italian law applies, the Court does not analyze Japanese ownership laws separately from its analysis of Italian law.

[9] Federal Rule of Civil Procedure 44.1 provides that "[i]n determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence."  Both parties filed expert affidavits on Italian law, *see* Docket Items 24-11 (affidavit of Massimo Foglia); 31-2 (affidavit of Simone Cadeddu); 33-9 (affidavit of Marco Mastracci), and the Court relies on those affidavits for its choice-of-law analysis.  The parties' recitations of Italian law are not identical, and they disagree about the construction and application of certain provisions of the Italian Civil Code.  But neither

And because a vehicle is a registered movable good, ownership of a vehicle must be registered on a public registry (the "PRA").  Docket Items 24-11 at ¶ 4; 31-2 at ¶ 11.

Notwithstanding the requirement that a vehicle be registered on the PRA, an owner's rights to property may be extinguished under *usucapione*, a doctrine similar to adverse possession that is incorporated into Article 1162 of the Italian Civil Code. Docket Item 31-2 at ¶¶ 12-13; 33-9 at ¶¶ 19-20.  Under that law:

> He who buys in good faith an asset from someone who is not the owner [of a] mobile registered in public registers, by virtue of a title that is suitable to transfer ownership and that it has been duly transcribed, he carries out the usucapion[e] in his favor with the course of three years from the date of transcription.
>
> If the conditions set out in the previous paragraph [are not met], the usucapione takes place after ten years.

Docket Item 31-2 at 19.  In other words, if a person acquires property from someone who is not the owner of a registered movable good, that person may become the owner if: (1) the buyer acted in good faith at the time of the purchase; (2) the buyer has a document capable of transferring ownership that has been entered into a public registry; and (3) the buyer possesses the vehicle for three years without interruption.  *Id.* at ¶ 12. And if those conditions are not met, the buyer nevertheless may become owner if ten years pass without interruption of possession.[10]  *Id.* at ¶ 13.  To meet the temporal

---

party disputes the central point that Italian law incorporates the doctrine of *usucapione* while New York law does not.

[10] The parties dispute whether the second paragraph of Article 1162 applies when a buyer acts in bad faith.  *Compare* Docket Item 31-2 at ¶ 6, *with* Docket Item 33-9 at ¶ 20.  Provenzi's expert says that it does not and that good faith is always necessary to take advantage of *usucapione*.  Docket Item 33-9 at ¶ 20.  In the absence of additional support from the parties, this Court is not prepared to say who is correct. In any event, neither party disputes that *usucapione* is a part of Italian law, and

requirement, a party may combine its period of possession with the prior possessor's time. *Id.* at ¶ 14. And even a stolen or lost item of property is susceptible to *usucapione*.

But *usucapione* has its limits. Similar to adverse possession's requirement that possession be "open and notorious," *see, e.g., Jaffer v. Hirji*, 887 F.3d 111, 116 (2d Cir. 2018), possession acquired in a "violent or clandestine manner" does not count towards the period of *usucapione* until the violence or the clandestine behavior ceases. Docket Item 31-2 at ¶ 15. Moreover, if the possessor recognizes the property rights of others, then the doctrine of *usucapione* cannot be applied. Docket Item 33-9 at ¶ 30.

### 2.    New York Law

New York law, by contrast, does not permit *usucapione* or adverse possession in the case of stolen goods. Rather, New York law protects "the right of the owner whose property has been stolen to recover that property, even if it is in the possession of a good-faith purchaser for value." *Solomon R. Guggenheim Found. v. Lubell*, 77 N.Y.2d 311, 317, 569 N.E.2d 426, 429 (1991). And so in New York, it is well settled that "a thief cannot pass good title." *Bakalar v. Vavra*, 619 F.3d 136, 140 (2d Cir. 2010).

Because Italian law permits personal property—including, depending on the circumstances, stolen property—to be acquired by *usucapione* and New York law does not, there is a conflict here.

---

regardless of whether paragraph two of Article 1162 requires good faith, this Court still would find that a conflict exists.

### B.     Interests Analysis

Having determined that there is a conflict, the Court turns to New York's

"interests analysis" to determine which jurisdiction has the greater interest in this

litigation.  *See Karaha Bodas Co.*, 313 F.3d at 85.  As explained above, "the facts or

contacts which obtain significance in defining State interests are those which relate to

the purpose of the particular law in conflict."  *Id.*  Before determining which jurisdiction

has the greater interest in the litigation, the Court reviews the relevant contacts in this

dispute.

As previously mentioned, the story starts (at least for the purposes of this case)

in Italy when Autoexotic acquired the Ferrari in February 2003 and registered the Ferrari

in its name.  Docket Items 24-21 at ¶ 4; 31-4 at ¶ 4.  The parties dispute how the Ferrari

left Autoexotic's hands—Provenzi alleges that it was stolen, Docket Item 24-21 at ¶ 7;

the Ikonick defendants claim not to know and seem to suggest it was not, Docket Item

31-4 at ¶ 7—but neither party disputes that the Ferrari somehow found its way from Italy

to Japan, Docket Items 9 at ¶ 23; 24-21 at ¶ 14.

The Ferrari then remained in Japan for roughly sixteen years.  According to the

Certificate of Car Registration obtained from the Japanese Road Transportation Bureau,

the Ferrari was first registered in Japan on June 25, 2003, to Marutoku, Ltd., and title

was transferred at least four more times while the car was still in Japan: from Marutoku,

Ltd., to Miyaoka Co., Ltd., on July 11, 2003; from Miyaoka Co., Ltd., to Total

Management Co., Ltd., on July 9, 2004; from Total Management Co., Ltd., to Taiseisyoji

Ltd. on December 3, 2018; and from Taiseisyoji Ltd. to Sabe, on October 1, 2019.

Docket Items 31-3 at ¶ 8; 31-3 at 14-19.

Alsaloussi then engaged C.A.R. Leasing in Montreal, Canada, to ship the Ferrari to Canada from Japan.  Docket Item 9 at ¶¶ 24-27.  The car arrived in Canada, and Alsaloussi acquired it from C.A.R. Leasing.  *Id.*  Ikonick says that it then registered the Ferrari in its name in the Canadian Province of Alberta.  *Id.* at ¶ 30.  The Ferrari was on its journey to the United States when it was stopped and seized at the New York border.  *Id.* at ¶ 31-32, 34.  Its intended destination was Florida.  Docket Item 1 at ¶ 6.  None of the original or intervening owners or purchasers are residents of New York.  Rather, Ikonick is in Alberta, Canada, *id.*; Alsaloussi is in Florida, *id.*; and Provenzi is in Italy, as was Autoexotic before its dissolution, Docket Item 10 at ¶¶ 17, 20.

This constellation of facts easily could be read to conclude that any law but New York's should apply.  But the interests suggest otherwise.  Although the alleged theft occurred in Italy, the Second Circuit has noted that the "locus of the theft [is] simply not relevant to the interest underlying" *usucapione*.  *Bakalar*, 619 F.3d at 144 (analyzing the German variant of *usucapione*).  Rather, the policy behind *usucapione* is "to protect bona fide purchasers" and "promote the security of transactions" within a country's borders.  *Kunstsammlungen Zu Weimar v. Elicofon*, 536 F. Supp. 829, 846 (E.D.N.Y. 1981), *aff'd*, 678 F.2d 1150 (2d Cir. 1982).  And if the goal is to promote security and certainty of transactions, that concern does not extend to extra-territorial transactions.  *Id.*  In other words, when the Ferrari left Italy, so did Italy's interests in promoting the security of transactions and bona fide purchasers within its borders.  Neither the subsequent transactions nor purchasers were in Italy.  The contacts between the Ferrari and Italy therefore have a minimal connection to the policy underlying *usucapione*.

On the other hand, the contacts with New York, though limited, are relevant to the interests underlying New York's law that a thief may not pass title. Although the transaction took place in Canada, Docket Item 9 at ¶¶ 24-27, New York was one of the planned conduits for the Ferrari's transport to Florida; in fact, New York is where Alsaloussi sought to bring the Ferrari across an international border, *id.* at ¶ 31-32, 34. In *Bakalar*, the Second Circuit emphasized New York's strong interest in its rule that a thief may not pass good title, noting that it is targeted at "protect[ing] owners generally *as a means to preserve the integrity of transactions and prevent[ing] the state from becoming a marketplace for stolen goods.*" 619 F.3d at 144 (emphasis in original) (quoting *Elicofon*, 536 F. Supp. at 846); *see also, e.g., Reif v. Nagy*, 61 Misc. 3d 319, 322-23, 80 N.Y.S.3d 629, 632 (Sup. Ct. N.Y. Cnty. 2018); *Angiolillo v. Christie's, Inc.*, 64 Misc. 3d 500, 518-19, 103 N.Y.S.3d 244, 259-60 (Sup. Ct. N.Y. Cnty. 2019) (applying New York law, and in particular, the law that "[t]he burden of proving title under New York law rests with the possessor," because "New York clearly has the greater interest in seeking to preserve the integrity of transactions within its borders and preventing the state from becoming a marketplace for stolen goods").

Moreover, the fact that the alleged theft took place in Italy does not negate New York's interest. "In applying the New York rule that a purchaser cannot acquire good title from a thief, New York courts do not concern themselves with the question of where the theft took place, but simply whether one took place." *Elicofon*, 536 F. Supp. at 846. Likewise, the fact that the alleged victim and successor in interest reside in Italy is not significant to New York's policy of "protect[ing] owners generally." *See id.* ("[T]he

residence of the true owner is not significant for the New York policy is not to protect resident owners, but to protect owners generally.").

The Ikonick defendants argue that New York "has only a negligible interest" in this case because the Ferrari never entered New York's commerce and the Ikonick defendants did not intend for the Ferrari to enter New York's commerce.  Docket Item 31 at 24.  It is true that no transaction took place, or was planned to take place, in New York.  But it is not disputed that the Ferrari was stopped in New York.  And the Southern District of New York's recent decision in *Howard University v. Borders*, 2022 WL 602829 (S.D.N.Y. Mar. 1, 2022), therefore is instructive.

In that case, an allegedly stolen piece of artwork spent nearly fifty years in North Carolina before it was shipped to New York in March 2020 to be auctioned by Soethby's.  *Id.* at *1-2, *9.  But before the auction occurred, questions arose about who owned the artwork.  *Id.* at *2.  Soethby's withdrew the artwork from the auction, and in June 2020, the parties commenced a lawsuit to settle the ownership issue.  *Id.*  In addressing the choice-of-law question, the *Howard University* court relied heavily on the Second Cirucit's decision in *Bakalar* and found it immaterial that the suit began before the sale of the artwork in New York, finding that "the interest of New York 'in preventing the state from becoming a marketplace for stolen goods,' is just as strong before the gavel hits as after."  *Id.* at *11 (citation omitted).  Moreover, it stressed that "New York [was ] the forum with which [the possessors] 'ha[d] voluntarily associated themselves' in connection with the potential sale."  *Id.* (quoting *Cooney v. Osgood Mach., Inc.*, 81 N.Y.2d 66, 77, 612 N.E.2d 277, 283 (1993)).

The court declined to adopt a rule hinging on "whether an agreement to sell had already been made in New York or title had transferred in the state," in part because that would lead to "illogical" and "impracticable" results.  *Id.* at *11-12.  For example, a rule requiring a sale would mean that New York has an interest only in "undoing sales of artwork as to which title is questionable, but no interest in preventing such sales . . . in the first place"—an odd proposition to say the least.  *Id.* at *12.  As the court noted, "[e]ither New York's interest in preserving the integrity of its art market is superior or it is not."  *Id.*  In addition, the court explained how a rule that hinged on whether a sale occurred would make New York's market "*more* unstable" because it would "incentivize an original owner to wait until a sale was consummated before asserting its claim . . ., rather than . . . in advance" when the owner first identifies the location of the good.  *Id.* (emphasis in original).

Although no one alleges that any transaction was planned for the Ferrari in New York, the Ikonick defendants likewise "voluntarily associated themselves" with New York by electing to ship the Ferrari through—indeed, to have the Ferrari cross an international border into—the state.  While the Ikonick defendants may not have planned to keep the Ferrari in New York very long,[11] they knew that the Ferrari would

---

[11] Although Alsaloussi may not have planned to keep the Ferrari in New York long, his overall plans for the Ferrari in the United States were less fleeting.  It appears that he planned to keep the Ferrari in Florida for at least six months.  *See* Docket Item 31-5 at 24 (The Ferrari "will be going to Florida as a snowbird for [six] months" and then "will [] return[] []to Canada.").  No party has argued that Florida law should apply.  But for what it is worth, like New York law, Florida law similarly protects an owner whose property has been stolen.  *See Alamo Rent-a-Car, Inc. v. Williamson Cadillac Co.*, 613 So. 2d 517, 518 (Fla. Dist. Ct. App. 1993) ("It is of course the general rule that a thief . . . cannot pass good title."); *see also Anderson Contracting Co. v. Zurich Ins. Co.*, 448 So. 2d 37, 38 (Fla. Dist. Ct. App. 1984) ("It has generally been held by Florida courts . . . in the absence of some intervening principle of estoppel, one cannot convey a better

need to be declared at the border and go through customs.  And they must have known

that CBP would review and scrutinize the importation of the Ferrari at the New York

border, even if its time in New York was only temporary.  So it is fair to assume that

having brought the Ferrari to New York, the Ikonick defendants had some expectation

that the Ferrari would be subject to New York law while it was here.  And with New

York's strong interest in "prevent[ing] the state from becoming a marketplace for stolen

goods," *see Bakalar*, 619 F.3d at 144, it follows that the state has an interest in not

being a pass-through for stolen goods and in keeping stolen goods out of its

marketplace in the first instance.[12]  *See Lubell*, 77 N.Y.2d at 317, 569 N.E.2d at 426

("New York case law has long protected the right of the owner whose property has been

---

title than he has and conversely, one cannot claim a better title than he, in fact,
receives.")

[12] It is not surprising that most cases involving choice-of-law questions similar to the one here stem from planned or completed transactions that gave rise to an ownership dispute.  Tracking down stolen goods—particularly items that have crossed state and national borders—is no easy feat.  *See, e.g.*, *O'Keeffe v. Snyder*, 83 N.J. 478, 496, 416 A.2d 862, 871 (1980) ("Open and visible possession of personal property, such as jewelry, may not be sufficient to put the original owner on actual or constructive notice of the identity of the possessor."  Moreover, "[l]ike many kinds of personal property, works of art are readily moved and easily concealed."); *see also* Soffia H. Kuehner Gray, *The Holocaust Expropriated Art Recovery Act of 2016: An Ineffective Remedy for Returning Nazi-Looted Art*, 2019 U. Ill. L. Rev. 363, 366–67, 396-97 (2019) (discussing how private collectors can keep art hidden "for years without anyone knowing the location or existence of the objects" and how collectors may hide items such as "fine art, rare books, . . . [and] classic cars" in "freeports"); Andrea E. Hayworth, *Stolen Artwork: Deciding Ownership Is No Pretty Picture*, 43 Duke L.J. 337, 367 (1993) (reviewing stolen artwork cases) ("[M]uch of the art that is recovered is located only after a fortuitous chain of events leads to the identification of the present location of the piece.  A recovery rate of around ten percent indicates that recovery is not the common result of diligent efforts."); Sydney M. Drum, *Deweerth v. Baldinger: Making New York A Haven for Stolen Art?*, 64 N.Y.U. L. Rev. 909, 933-34, 944 (1989) (discussing the difficulties of locating and recovering international stolen art).  It therefore makes sense that most victims of theft learn about the location of their stolen property only after the property is advertised for sale.

stolen to recover that property, even if it is in the possession of a good-faith purchaser for value.").

Moreover, although Alsaloussi says that he brought the Ferrari to the United States simply for his personal use and not to sell it, Docket Item 31-5 at 24-27, the adoption of a rule that turns upon whether an item is being transported for personal use or for an intended sale would lead to strange results. Consider, for example, stolen goods that are physically present—but not intended to be sold immediately—in New York. If an owner somehow manages to track down his stolen property, that owner would not benefit from New York's case law "that has long protected the right of the owner whose property has been stolen." *See Lubell*, 77 N.Y.2d at 317, 569 N.E.2d at 426. Now suppose that the possessor changes his mind and decides to sell the property in New York. Unless the owner somehow learns about that change of heart and challenges ownership again, that owner still would fail to benefit from New York's case law protecting the owner. So if the purpose of New York's rule is to "protect owners generally," *see Elicofon*, 536 F. Supp. at 846, the owner should receive protection as soon as the owner learns that the stolen property is in New York, regardless of whether a New York sale is "intended."[13]

This Court acknowledges that many of the choice-of-law cases that address "protect[ing] owners" and "prevent[ing] the state from becoming a marketplace for stolen goods," *Bakalar*, 619 F.3d at 144 (emphasis removed), involve the recovery of items of

---

[13] What is more, when New York wants to protect property based on the intended use, it knows how to do that. For example, New York exempts from replevin and seizure property that is in New York for—or traveling through New York for—certain international exhibitions. *See* N.Y. Pers. Prop. Law § 250. It has not done the same thing for property brought into New York for personal use.

cultural patrimony or the recovery of art looted during the Holocaust. *See, e.g.*, *id.* at

138-39 (ownership dispute regarding artwork expropriated during the Holocaust);

*Reif*, 61 Misc. 3d at 321, 80 N.Y.S.3d at 631 (same).  But the holdings in those cases

are not limited to items of cultural patrimony or items expropriated during the Holocaust,

nor should they be.  Indeed, New York has applied the same choice-of-law analysis in a

case involving a valuable diamond allegedly stolen from the owner's heirs in Italy.  *See*

*Angiolillo*, 64 Misc. 3d at 503-04, 509-10, 103 N.Y.S.3d at 249, 253-54 (holding that the

choice-of-law analysis in *Bakalar* and *Reif* were not "limited to Holocaust art recovery

cases" but also applied "to other art, jewelry[,] and artifacts cases involving suspect

provenance").  And if the analysis covers a case like that, it also should cover the case

of a secondhand luxury automobile.

    For all those reasons, this Court finds, for purposes of this decision, that the

interest of New York in applying its law prevails over Italy's.[14]

---

[14] In their response to the objection, the Ikonick defendants suggest in passing that Canadian law might apply to this dispute.  *See* Docket Item 42 at 11.  But they have not said anything more about Canadian law or how it may apply.

"Rule 44.1 of the Federal Rules of Civil Procedure permits parties to present information on foreign law, and the court may make its own determination of foreign law based on its own research" but "it is not mandatory that it do so."  *Loebig v. Larucci,* 572 F.2d 81, 85 (2d Cir. 1978); *see also Indep. Order of Foresters v. Donaldson, Lufkin & Jenrette, Inc.,* 919 F. Supp. 149, 152 (S.D.N.Y. 1996) ("In New York, it is required that a party wishing to apply the law of a foreign state show how that law differs from the forum state's law.  Failure to do so results in the application of New York law."). Nevertheless, this Court has investigated whether Canada also follows the common law principle of *nemo dat*, that is, that one cannot convey greater rights to property than one received.  It generally appears that it does.  *See* Alan Schwartz & Robert E. Scott, *Rethinking the Laws of Good Faith Purchase*, 111 Colum. L. Rev. 1332, 1371 (2011) (noting that Canada generally "allow[s] original owners to prevail in [] theft cases").  Both Québec, where the Ferrari was imported, and Ontario, where the Ferrari was located immediately before entering the United States, appear to "adopt[] *nemo dat* as [a] base principle" and protect original owners against theft.  *Id.* at 1378.  Québec also provides some protections to good-faith purchasers, requiring the owner to compensate a good-

II.     **GENUINE ISSUE OF MATERIAL FACT**

Although the Court agrees with Provenzi that "issues of material fact concerning the lawful ownership of the automobile" do not preclude the Court from engaging in a choice-of-law analysis, it does not agree with Provenzi's assertion that there is no genuine dispute of material fact that he is the lawful owner of the Ferrari under New York law.  *See* Docket Item 24-22 at 13-14; Docket Item 40 at 11-16.  Rather, this Court agrees with Judge McCarthy that "there are issues of material fact concerning the lawful ownership of the automobile that the Ikonick defendants are entitled to explore through discovery," including "the circumstances surrounding the alleged theft of the automobile in 2003."  Docket Item 37 at 5.

As explained above, in New York "a thief cannot pass good title."  *Bakalar*, 619 F.3d at 140.  Under New York law, if the alleged theft victims "ma[ke] a threshold showing that they have an arguable claim to the [property]," the burden is placed on "the current possessor[] to prove that the [property] was not stolen."  *Id*. at 147.

Provenzi asserts that it is undisputed that "[t]he [v]ehicle was stolen from Autoexotic on March 30, 2003."  Docket Item 40 at 5.  In support, he points to the Italian police report as well as the Interpol report of the theft.  *Id.*  And he argues that the

_____

faith purchaser who acquired the property "in the ordinary course of a business enterprise."  *Id.*  Alberta, where the Ikonick defendants registered the Ferrari, likewise follows the common law principle of *nemo dat*, and a "buyer acquires no better title to the goods than the seller had unless the owner of the goods is by the owner's conduct precluded from denying the seller's authority to sell."  Sale of Goods Act, R.S.A. 2000, c S-2, s 23, https://canlii.ca/t/81v0#sec23.  So the laws of the three Canadian provinces with connections to the Ferrari are similar to New York's, suggesting that there may not even be a conflict between New York and Canadian law.  And to the extent there is a conflict, the purpose behind the laws of the three Canadian provinces supports protection of the owner's interest.

Ikonick defendants cannot seriously contend that the Ferrari was not stolen because even Ikonick's sales contract acknowledged that the Ferrari had been reported as stolen in 2003.  *Id.*; *see* Docket Item 31-5 at 14.  But acknowledging that the Ferrari was *reported* as stolen is not the same as admitting that the Ferrari was *in fact* stolen.

Moreover, because there are questions about the theft, this is not one of those rare cases where summary judgment should be granted against a party who has not had the opportunity for discovery.  *See Hellstrom*, 201 F.3d at 97.  For example, as Judge McCarthy explained, "the registration in Japan and Canada constitutes at least some evidence of [the Ikonick defendants'] lawful ownership of the automobile" that warrants discovery on the circumstances of the alleged theft.  Docket Item 37 at 6.  According to Chie Kasahara, the Ikonick defendants' expert in Japanese law, Japan will issue a new registration for a vehicle unless the applicant is found to not "have ownership of the motor vehicle in question" or "when it is found that there is a false statement in the matters pertaining to the application."  Docket Item 31-3 at ¶ 10.  And if a false statement is discovered in the application, an applicant faces a fine of 500,000 yen.  *Id.* at ¶ 13.  To export a vehicle from Japan, a party also must obtain an export certificate and "Japanese Customs [] reviews all paperwork and determines whether to allow the vehicle[] to be exported."  *Id.* at ¶ 16.

The Ferrari went through all these steps in Japan and its export was permitted. Docket Items 31-3 at 17-19 (Japanese Certificate of Car Registration); 31-5 at 7 (Japanese Export Certificate).  And that suggests that someone other than Provenzi was the legitimate owner—at least as far as Japan was concerned.

23

What is more, the Ferrari appears to have always been registered under the original VIN, including upon its arrival in Canada.  *See* Docket Items 31-3 at 17 (Japanese Certificate of Car Registration); 31-5 at 7 (Japanese Export Certificate), 16 (Canadian customs paperwork), 33 (Canadian Registration).  Indeed, as Judge McCarthy noted, the Interpol theft report included the same VIN, and both Japan and Canada are members of Interpol.  Docket Item 37 at 7 (citing Docket Item 33-2 at 7; https://www.interpol.int/en/Who-we-are/Member-countries).  So it is unclear how the Ferrari continued to be registered under the original VIN without some proof of ownership or some indication that the Ferrari had not been stolen.

For all those reasons, and for the reasons stated by Judge McCarthy in the R&R, the Ikonick defendants have raised genuine issues of material fact that are sufficient to defeat summary judgment—at least at this early stage of the litigation when they have not had an opportunity to conduct discovery.[15]

III.   **RULE 44.1 STATEMENT**

Judge McCarthy recommended that the Ikonick defendants be permitted to amend their answer to include a Rule 44.1 notice but that their request to amend to

---

[15] Judge McCarthy also found that "even if the record demonstrated that the Ikonick defendants were not the lawful owners of the automobile and therefore were entitled to no discovery on that issue, factual issues remain as to Provenzi's ownership interest [as compared to the interest of the other former partners of Autoexotic] in the automobile" and recommended that summary judgment should be denied on that basis.  Docket Item 37 at 8.  Provenzi objects, arguing that there is no genuine issue of material fact as to his ownership interest.  Docket Item 40 at 16-18.  Because this Court agrees with Judge McCarthy that there is a genuine issue of material fact as to whether the Ferrari was stolen, it need not and does not reach whether there are other triable issues of fact, including Provenzi's ownership interest.

include a statute of limitations defense be denied.[16]  Docket Item 37 at 10-11.  Provenzi objects, arguing that the Rule 44.1 notice "fails for want of particularity" and that it "must fall [] with the . . . 'statute of limitations' [defense] to which it was inextricably linked." Docket Item 40 at 20.  This Court agrees with Judge McCarthy.

Rule 44.1 provides that "[a] party who intends to raise an issue about a foreign country's law must give notice by a pleading or other writing."  Issues of foreign law clearly have been raised already, and both parties' affidavits on Italian law were material to this Court's analysis of the choice-of-law question on ownership.  As Judge McCarthy noted, the Ikonick defendants appropriately provided a Rule 44.1 notice of their intent to raise an issue of foreign law.  Docket Item 37 at 10-11.  The Court sees no reason not to permit the Ikonick defendants to amend their answer to include that notice. Therefore, and for the reasons stated in the R&R, the Ikonick defendants may amend their answer to include a Rule 44.1 notice.

## CONCLUSION

For the reasons stated above, Provenzi's motion for partial summary judgment, Docket Item 24, is DENIED, and the Ikonick defendants' motion to amend, Docket Item 29, is DENIED IN PART and GRANTED IN PART.  The case is referred back to

---

[16] The Ikonick defendants did not object to Judge McCarthy's recommendation that they not be permitted to amend their answer to include a statute of limitations defense.  Neither 28 U.S.C. § 636 nor Federal Rule of Civil Procedure 72 requires a district court to review the recommendation of a magistrate judge to which no objections are raised.  *See Thomas v. Arn*, 474 U.S. 140, 149-50 (1985).  Nevertheless, the Court has reviewed Judge McCarthy's recommendation in this regard, agrees with him, and denies the Ikonick defendants' request to amend their answer to include a statute of limitations defense.

Judge McCarthy for further proceedings consistent with the referral order of May 13, 2021, Docket Item 22.


        SO ORDERED.


Dated:        July 6, 2022
              Buffalo, New York


                                        /s/ Lawrence J. Vilardo
                                        _____
                                        LAWRENCE J. VILARDO
                                        UNITED STATES DISTRICT JUDGE